El Pueblo, Demandante y Apelado, *v.* Juliá et al., Acusados y Apelantes.

Apelación procedente de la Corte de Distrito de San Juan, Sección Segunda, en causa por delito de conspiración.

No. 1111.—Resuelto en mayo 21, 1917.[1]

Jueces de Distrito—Facultades del Gobernador para Ordenar que un Juez de Distrito Ocupe el Puesto de Otro—Enfermedad—Licencia.—La facultad concedida al Gobernador por la ley de 10 de marzo de 1904 dictada para reorganizar el sistema judicial para que cuando el servicio público lo exigiere pueda ordenar a un juez de distrito que ocupe el puesto de otro, que se halle temporalmente impedido, no está limitada al caso de impedimento legal

---

[1] En julio 3, 1917, se denegó reconsideración solicitada por Clemente Ramírez de Arellano y se declaró no haber lugar a conceder un auto de error pedido por José Calderón Aponte.

sino que se refiere también a los de enfermedad, licencia o cualquiera otra causa que le impida conocer del asunto.

Id.—Traslado de Jueces—Juramento del Juez Nombrado.—Un juez de distrito no deja de ser tal juez por tener licencia para ausentarse de su cargo durante determinados días, y puede, por tanto, válidamente, tomar juramento al juez que ha de sustituirle, quien hasta que lo presta no es legalmente juez de la corte.

Conspiración—Confabulación para Admitir a Exámenes y Expedir Títulos a Personas Incapaces—Junta Examinadora de Aspirantes a Farmacéuticos—Actos Perjudiciales a la Salud Pública—Pervertir la Debida Administración de las Leyes—Acusación Suficiente.—En este caso la acusación imputa a los acusados que, siendo miembros de la Junta Examinadora de Aspirantes a Farmacéuticos, se combinaron y pusieron de acuerdo para aprobar los exámenes de determinados aspirantes a farmacéuticos que no tenían capacidad legal para ser matriculados y admitidos a exámenes y a los que les facilitaron las contestaciones que habían de dar a las preguntas que tenían que contestar para obtener el título de farmacéuticos, en la inteligencia de que las copias de tales contestaciones serían devueltas para calificarlas y obtener de los demás miembros de la Junta Examinadora que también calificaran como buenos tales exámenes para de esa manera otorgarles el título y licencia para el ejercicio de la profesión de farmacia en esta isla, actos que son perjudiciales a la salud pública y encaminados a pervertir la debida administración de las leyes otorgando títulos de farmacéuticos a personas incapaces y desconocedoras de su profesión. *Se resolvió:* Que el objeto de la conspiración era otorgar corruptamente títulos de farmacéuticos a personas incapaces y que de acuerdo con los artículos 62 y 63 del Código Penal y 246 del de Enjuiciamiento Criminal, la acusación es suficiente, no siendo necesario que en ella se alegue que los acusados realizaron el acto de aprobar los exámenes, porque según la ley, basta con alegar algún acto tendente a la realización del objeto de la conspiración.

Id.—Consecuencias Naturales de los Actos del Acusado—Intención.—Es doctrina constante de la ley y de la jurisprudencia que toda persona intenta las consecuencias naturales de sus actos, por lo que, por dedicarse intencionalmente a una conspiración que necesaria y directamente produce el resultado que el estatuto quiso impedir está, en el sentido legal, acusado de haber intentado el resultado.

Id. — Prueba Circunstancial — Inferencias o Deducciones — Reunión de los Acusados para Concertar los Medios o Poner en Práctica el Propósito Común.—Existe fuerte prueba circunstancial demostrativa de que los acusados estaban combinados para admitir a exámenes a personas incapaces para ello y para expedir títulos a personas desconocedoras de la profesión de farmacia, facilitándoles las contestaciones porque no conocían las asignaturas requeridas por la ley y que a ese fin unos ejecutaban unos actos y otros de los conspiradores otros, lo que es bastante para llegar a la conclusión de que existía entre ellos una conspiración con el fin indicado, que es contrario a la salud pública y a la debida administración de las leyes, ya que no es necesario probar la conspiración misma porque por lo general sería imposible presentar dicha prueba por evidencia directa dada la reserva con que se adoptan esos planes. Generalmente la prueba consiste en inferencias o deducciones derivadas de los hechos realizados, siendo bastante cuando uno eje-

cuta parte del plan de la combinación y el otro otra parte del mismo para ejecutarlo enteramente, aun cuando jamás se reunieran para concertar los medios o para poner en práctica el propósito común.

ID.—INCONGRUENCIA ENTRE LA ACUSACIÓN Y LA PRUEBA—MÓVIL PARTICULAR DE LA CONSPIRACIÓN.—No existe variación alguna entre la acusación y la prueba de este caso, porque si bien se probaron distintos actos de pedir dinero por los acusados para aprobar los exámenes de los aspirantes y admitirlos sin tener condiciones para ello, ésta era la manera de probar los actos que tendían a la ejecución del delito que se les imputó en la acusación. El móvil particular de la conspiración no era importante, pues pudo probarse cualquier otro que no fuera la especulación por dinero, con tal que se probara que había alguno por el cual estaban combinados los acusados para realizar actos contrarios a la debida administración de las leyes o perjudiciales a la salud pública.

ID.—AGENTES DEL GOBIERNO—DEFENSA.—No constituye defensa que un agente del gobierno haya fingido prestar su consentimiento facilitando los medios para la comisión de un delito, cuando no se trata de probar dicho delito sino que existía un plan general para la comisión de actos delictivos.

PRUEBAS—ORDEN EN SU PRESENTACIÓN—DISCRECIÓN JUDICIAL.—El juez tiene facultad discrecional en el orden de la presentación de la prueba, por lo que no existe perjuicio para un acusado en que se admita la declaración de un testigo antes que la de otro.

ID.—PRUEBA DOCUMENTAL—TESTIGOS.—No sufre perjuicio alguno un acusado con la presentación y admisión como prueba de un documento, cuando los hechos en él expresados son también declarados por testigos.

ID.—PRUEBA DE REFERENCIA—ERROR INSUFICIENTE.—La admisión por el juez de prueba de referencia, cuando el juicio se celebra ante el tribunal de derecho, manifestando que le daría el valor que en derecho tuviera, no constituye un error que sirva de base para revocar la sentencia.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. J. Henri Brown* y *Manuel F. Rossy*.

Abogados del apelado: *Sres. Earle T. Fiddler, Attorney General Auxiliar, Salvador Mestre, Fiscal del Supremo* y *Luis Campillo, Fiscal del Distrito*.

EL JUEZ ASOCIADO SR. ALDREY, emitió la opinión del tribunal.

Los apelantes Pedro Juliá, Clemente Ramírez y José Calderón Aponte fueron acusados, en unión de otras personas, del delito de conspiración, ante la Corte de Distrito de San Juan, Sección 2ª. Las tres personas nombradas fueron declaradas culpable de dicho delito y las demás absueltas y contra tal sentencia interpusieron aquéllas este recurso de

apelación en el que no ha comparecido el apelante Juliá; Calderón Aponte no presentó en tiempo alegato consignando los errores que a su juicio den lugar a la revocación de la sentencia, pero su abogado asistió a la vista de esta apelación e hizo oralmente sus alegaciones, y el otro apelante Clemente Ramírez de Arellano presentó su alegato escrito consignando cuatro motivos de error para la revocación de la sentencia dictada contra él, y su abogado concurrió también a la vista que tuvo lugar en esta Corte Suprema.

La acusación que el Fiscal presentó contra los apelantes alega que ellos en unión de otras personas cuyos nombres no es necesario consignar ahora, cometieron un delito de conspiración porque allá por los meses de septiembre de 1914 y febrero de 1915, en ocasión de ser los tres apelantes miembros de la Junta de Farmacia de esta isla y como tales miembros de la Junta Examinadora de Aspirantes a Farmacéuticos para cuyos cargos fueron legalmente nombrados, en el distrito judicial de San Juan, de una manera ilegal, voluntaria y maliciosa se combinaron, conspiraron y pusieron de acuerdo para aprobar los exámenes de los aspirantes a farmacéuticos Francisco Carmona Rivera, Eduardo Platet, Jesús María López Molina, Manuel Colón Bonilla, José Luis Weiwar, Armando Font Rodríguez, Eduardo Badó, Juana Albandoz, Eleuteria Colón y Santiago Rodríguez, cuyos exámenes debían celebrarse y se celebraron en esta ciudad de San Juan en el mes de enero de 1915, individuos que no tenían capacidad legal para ser matriculados y admitidos a exámenes y a los que les facilitaron las contestaciones a las preguntas correspondientes a cada una y todas de las asignaturas que determina la ley deben ser objeto de los exámenes y que fueron objeto de los mismos, y los cuales debían aprobar a fin de obtener el título de farmacéuticos, en la inteligencia de que dichos examinandos copiarían tales contestaciones que contestaban las preguntas que iban a ser objeto de los exámenes y una vez copiadas les devolverían las

copias que de ellas hicieran para calificarlas y obtener que los demás miembros de la Junta Examinadora calificasen como buenos dichos exámenes de ese modo copiados, para de esa manera ilegal, corrupta y maliciosa otorgarles el título y licencia para el ejercicio de la profesión de farmacéuticos en esta isla, cuyas contestaciones les fueron devueltas a los referidos acusados juntas con las copias que de ellas fueron hechas por los citados examinandos presentados a exámenes, actos que son perjudiciales a la salud pública, encaminados a pervertir u obstruir la justicia o la debida administración de las leyes, otorgando títulos y licencias para el ejercicio de la profesión de farmacia en Puerto Rico a personas incapaces y desconocedoras de su profesión.

Como uno de los motivos en que el apelante Clemente Ramírez basa su recurso para pedirnos la revocación de la sentencia apelada es que el Sr. Sepúlveda que conoció del caso no tenía facultad para actuar como juez en el juicio de este caso, nos parece conveniente considerar en primer término esta cuestión.

El delito imputado es menos grave por la naturaleza de la pena que apareja y por tanto no conoció de él un jurado sino el juez de la Corte de Distrito de San Juan. El juicio comenzó el 24 de junio de 1915 y terminó por sentencia dos días después, conociendo de él el Sr. Sepúlveda, Juez de la Corte de Distrito de Ponce, en virtud del nombramiento que recibió del Hon. Gobernador de esta isla para que conociese de todos los asuntos de las Secciones Primera y Segunda de la Corte de Distrito de San Juan durante el período de tiempo comprendido desde el 22 al 26 de junio de 1915. En dicho nombramiento se hizo constar como fundamento para hacerlo que el juez de la Sección Primera estaba ausente con licencia en los Estados Unidos y que al juez de la Sección Segunda se le había concedido una licencia para ausentarse desde el 22 al 26 de junio 1915. En virtud de este nombramiento el Juez de Distrito de Ponce, Sr. Sepúlveda, prestó juramento

como Juez del Distrito de San Juan el día 22 ante el juez de la Sección Segunda, Don Jesús María Rossy.

El primer motivo que tiene el apelante Ramírez para sostener que el Juez Sr. Sepúlveda no tiene facultad para actuar como juez en este asunto es que, de acuerdo con la sección segunda de la ley de 10 de marzo de 1904 dictada para reorganizar el sistema judicial, el Gobernador sólo puede ordenar que un juez de distrito desempeñe los deberes de otro juez de distrito cuando el último esté temporalmente impedido (*disqualified*), tomando el apelante esta palabra en el sentido de incapacidad por algún motivo legal para desempeñar sus funciones, pero que esta incapacidad no comprende el motivo de ausencia.

Esa sección de la ley da facultad al Gobernador de esta Isla para que cuando el servicio público lo exigiere, pueda ordenar a un juez de distrito que ocupe el puesto de cualquiera de los jueces de distrito nombrados regularmente y que se hallen temporalmente impedidos (*disqualified*) ya por enfermedad o por cualquier otra causa. Su lectura demuestra claramente que la facultad que concede al Gobernador no es sólo por hacer nombramientos cuando el propietario esté impedido (*disqualified*) en el sentido legal de esta palabra, o sea cuando no pueda legalmente conocer del asunto, sino que se refiere también a impedimentos por enfermedad o por cualquiera otra causa. Es más amplia que el significado que quiere darle el apelante y comprende no sólo los casos de enfermedad y de impedimento legal sino cualquiera otra que le impida conocer del asunto, y como en este caso el juez regularmente nombrado Señor Rossy tenía licencia para ausentarse de la corte, tenía facultad el Gobernador para hacer el nombramiento de otro juez de distrito que le reemplazase durante el tiempo que durase su licencia, en bien del servicio público, por lo que no podemos declarar que existe el error que se atribuye por el apelante.

También sostiene el apelante que pudiera dudarse de si el juramento que prestó el Señor Sepúlveda ante el Juez Sr. Rossy es legal porque el día en que el juez lo tomó estaba impedido (*disqualified*) para todos los deberes de su cargo. El juez Sr. Rossy no dejó de ser tal juez por tener licencia para ausentarse de su cargo durante los días expresados, y por tanto podía válidamente tomar el juramento del Señor Sepúlveda, quien hasta que lo prestó no era legalmente juez de la Sección Segunda de la Corte de Distrito de San Juan y no vemos, por tanto, que no fuera legal.

Otro de los fundamentos del recurso, que se consigna bajo el número uno de los señalamientos de errores, es que los hechos denunciados en la acusación no constituyen delito público.

La acusación, en pocas palabras, imputa a los acusados que siendo miembros de la Junta Examinadora de Aspirantes a Farmacéuticos se combinaron y pusieron de acuerdo para aprobar los exámenes de determinados aspirantes a farmacéuticos que no tenían capacidad legal para ser matriculados y admitidos a exámenes y que les facilitaron las contestaciones que habían de dar a las preguntas que tenían que contestar para obtener el título de farmacéuticos con objeto de calificar las copias y obtener de los demás miembros de la Junta Examinadora que calificaran como buenos tales exámenes para de esa manera otorgarles el título y licencia para el ejercicio de la profesión de farmacia en esta isla, actos que son perjudiciales a la salud pública y encaminados a pervertir la debida administración de las leyes otorgando títulos de farmacéuticos a personas incapaces y desconocedoras de su profesión.

Como se ve más claramente por el resumen que hemos hecho de la acusación, la conspiración de tres de los cinco miembros de la Junta Examinadora consistió en otorgar títulos de farmacéuticos a personas incapaces de ejercer tal profesión y los actos que realizaron fueron los de admitir-

los a exámenes sin tener capacidad legal para ser matriculados, y calificar las contestaciones que copiándolas debían dar para conseguir el título de farmacéuticos.

Según el artículo 62 del Código Penal existe el delito de conspiración, entre otros casos, cuando dos o más personas conspiraren para cometer algún acto perjudicial a la salud pública o encaminados a pervertir u obstruir la justicia o la debida administración de las leyes; disponiéndose por el artículo 63 del mismo que ningún convenio, excepto para cometer delito grave contra alguna persona o para incendiar o asaltar moradas, constituye conspiración a no concurrir algún acto para llevarla a cabo por uno o más de las personas combinadas. Por su parte el artículo 246 del Código de Enjuiciamiento Criminal dispone que en persecuciones por conspiración, siempre que para constituir el delito se requiera que haya habido principio de ejecución del acto, no podrá ser convicto el acusado a menos que uno o más de tales actos hayan sido expresamente denunciados en la acusación y se prueba uno de ellos, por más que otros actos manifiestos no denunciados o alegados podrán presentarse como prueba.

De acuerdo con estos preceptos la acusación en este caso es suficiente porque siendo el objeto de la conspiración de los tres miembros de la Junta Examinadora de Aspirantes al Título de Farmacéuticos otorgar corruptamente títulos de farmacéuticos a determinadas personas sin que los aspirantes tuvieran capacidad legal para ser matriculados y admitidos a examen y para obtener el título, se expresan en ella actos para llevar a cabo la conspiración por parte de las personas combinadas para admitir a examen a los aspirantes expresados, tales como que les facilitaron las contestaciones de las preguntas que debían contestar correspondientes a las asignaturas que determina la ley deben ser objeto de los exámenes para que puedan obtener tal título, actos que siendo ciertos, como hay que suponer que lo son cuando se discute la suficiencia de una acusación, demuestran que los

acusados habían dado principio a la ejecución de la conspiración.

Eso es todo lo que debe contener la acusación por un delito como el perseguido en este caso, por lo que fué suficiente, y no era necesario que en ella se alegara, como pretende el apelante, que los acusados realizaron el acto de aprobar los exámenes, que era el fin de la conspiración. Según la ley, basta con alegar algún acto que tienda a la realización del objeto de la conspiración.

Que el fin de la conspiración era un acto perjudicial a la salud pública y obstructivo de la debida administración de las leyes no puede dudarse por un momento. Existe una ley en vigor en Puerto Rico creando una Junta de Farmacia cuyo objeto es, según se desprende de su simple lectura, impedir que ejerzan la profesión de farmacéuticos personas que no tuvieren ciertos conocimientos, en beneficio de la salud y bienestar públicos, evitando de esa manera que personas incompetentes por la carencia de tales estudios tuvieren a la venta y despachasen drogas, capaces muchas de ellas de producir males y también la muerte. Es una ley altamente beneficiosa para el bien común y que por espacio de muchos años ha estado rigiendo en esta isla. Para conseguir estos fines la ley creó una junta compuesta de cinco farmacéuticos expertos, de buena reputación, residentes en esta isla, debidamente graduados y con más de cuatro años de práctica, cuya misión es la de expedir certificados de farmacéuticos a las personas que acreditasen ante ellos tener conocimientos de ciertas materias que la misma ley expresa, aspirantes a títulos que además deben tener determinados estudios generales previos, como el de haber aprobado todas las materias correspondientes al curso científico y literario de alguna alta escuela de la isla o de alguna institución similar o análoga de los Estados Unidos o de cualquiera otra parte satisfactoria para la junta. También deben los aspirantes al título de farmacéutico acreditar por medio de un certi-

ficado firmado y jurado por un boticario acreditado que ha
practicado en su botica por un espacio no menor de dos años.
Además, las matrículas de los aspirantes deberán formularse
en la primera quincena de octubre para celebrarse los exá-
menes en la segunda quincena de enero y junio, y todos los
gastos exigidos por la ley se reducen a diez dollars por de-
rechos de examen que se entregarán al secretario y veinte
y cinco dollars para que se les expida la licencia.   En cuanto
a los exámenes, habrán de ser por escrito.

Así pues, si los acusados apelantes, como miembros de
esa junta de farmacia, se combinaron y confabularon para
admitir a exámenes y dar títulos de farmacéuticos a perso-
nas incapaces y uno de los medios que emplearon para lle-
varlo a efecto fue el de facilitar las contestaciones que los
aspirantes debían dar a las preguntas que de acuerdo con
la ley debían contestar, es innegable no sólo que esa conspi-
ración era contra la salud pública porque ese resultado era
consecuencia natural de sus actos, sino también contra la
ley citada cuyo cumplimiento les estaba encomendado, ya que
eran ellos los encargados de exigir los documentos necesarios
para admitir a los aspirantes, de hacer los interrogatorios
que habían de contestar, de calificar los exámenes y de expe-
dir los certificados o títulos de farmacéuticos.   Es doctrina
constante de la ley y de la jurisprudencia que toda persona
intenta las consecuencias naturales de sus actos; y en el caso
de *United States* v. *Patten,* 226 U. S. 525, que en un caso de
conspiración, la Corte Suprema dijo en la página 543, entre
otras cosas, lo siguiente: ''En otras palabras, por dedicarse
intencionalmente a una conspiración que necesaria y direc-
tamente produce el resultado que el estatuto quiso impedir,
ellos (los conspiradores) están, en el sentido legal, acusa-
dos de haber intentado el resultado. *Addyston Pipe & Steel
Co.* v. *United States,* 175 U. S. 211, 243; *United States* v.
*Reading Co.,* 226 U. S. 324, 370.''   Por eso no era necesario

que la acusación en el caso que estamos considerando alegara la intención más específicamente de como lo hizo.

Si la acusación no dijera que los apelantes admitían a exámenes a personas incapaces y que les facilitaron las contestaciones que habían de dar tendría entonces razón el apelante Ramírez al decir que el convenio para aprobar exámenes era para cumplimentar la ley, mas no con la alegación que tiene la acusación, ya que no se cumple facilitando las contestaciones para que aparezcan como personas capaces, como farmacéuticos, aquellas que han tenido que copiar las contestaciones en las diversas asignaturas de la profesión.

El apelante se queja de que el Fiscal nada dijo en su acusación de sobornos individuales y que en el juicio trató de probar tales sobornos, pero es que esa prueba no estaba presentada para probar sobornos sino para por medio de ellos demostrar la existencia general de la conspiración. La idea de la acusación no era la idea de sobornos individuales sino de un sistema corrupto de permitir la obtención de títulos a personas no capacitadas.

En cuanto a la intención criminal de la conspiración, resulta de los propios actos que alega la acusación, pues exigiendo la ley determinados conocimientos para obtener el título de farmacéuticos, la combinación para otorgarlos a personas que no tienen esos conocimientos porque tienen que copiar las contestaciones, demuestra claramente que se iban a otorgar títulos a personas a quienes la ley no quería permitarles el ejercicio de la profesión de farmacia, causando así un daño voluntario y criminal al público en cuyo beneficio se promulgó la ley, y el mero hecho de entregar las contestaciones demuestra también que los apelantes sabían que los dichos aspirantes no conocían las asignaturas requeridas por la ley.

El tercer motivo de error que se alega se refiere a que no se probó que el apelante Ramírez cometió el delito de conspiración alegado en la acusación.

Para sostener esta alegación expone el apelante que la prueba tendió a demostrar la comisión de distintos delitos de soborno en cada uno de los cuales los principales eran distintas personas y que en ningún caso participaron todos los tres acusados declarados culpables de delito de conspiración; que hubo prueba tendente a demostrar que Juana Albandoz había comprado al apelante Ramírez en cien pesos contestaciones a preguntas y que en este negocio intervino Edelmira Santana, acusada que fué absuelta, pero que falta prueba para relacionar otro de los acusados con la transacción; que hubo prueba tendente a demostrar que Jorge Weiwar había pagado al acusado Juliá ciento veinte y cinco pesos para poder copiar contestaciones sin que exista prueba de que otro de los acusados tuviera intervención o relación alguna con ese asunto; que hubo también prueba tendente a demostrar que Jesús María López Molina sobornó al acusado Calderón Aponte para la cuestión de los exámenes, pero que no hubo prueba de que otro de los acusados tuviera algo que ver o conocimiento. del asunto de López Molina; y que hubo prueba tendente a demostrar que Manuel Colón Bonilla había sobornado a Ramírez y a Juliá para poder ser matriculado y admitido a examen.

Pero es que la prueba demostró además que el apelante Pedro Juliá, Presidente de la Junta de Farmacia, era el único que se entendía con la matrícula de los aspirantes a exámenes y con los documentos que con ella habían de presentarse; que la Señorita Juana Albandoz, que entregó cien pesos a Edelmira Santana, acusada que fué absuelta, porque el apelante Ramírez le dijo que se entendiera con ella para la cuestión del dinero, fué matriculada y admitida a examen a pesar de que carecía de los estudios previos que exige la ley, pues no tenía certificado de estudios de alta escuela, ni aún del octavo grado, habiendo estudiado sólo hasta el quinto grado en la escuela pública, y tampoco había estudiado algunas

de las asignaturas de farmacia, las que copió de las contestaciones que le entregó el apelante Ramírez.

También demostró la prueba que López Molina, quien mediante un documento se comprometió a pagar al apelante Calderón Aponte doscientos pesos porque se le admitiera a examen para que se le expidiera el título sin tener los dos años de práctica en una farmacia, como exige la ley, fué matriculado y admitido a examinarse por el apelante Juliá, encargado de la matrícula.

También que Manuel Colón Bonilla, a quien pidió Calderón Aponte cuatrocientos pesos, y que luego se entendió por quinientos con Juliá y con Ramírez conjuntamente, fué admitido al examen para obtener el título sin tener los dos años de práctica, requisito que suplió Juliá con una certificación falsa que obtuvo de un boticario y también le suplió su falta de estudios previos preparatorios con otra certificación también falsa solicitada por él, aspirante a quien el acusado Ramírez facilitó las contestaciones para que las copiara.

Esos diversos actos eran fuerte prueba circunstancial demostrativa de que los acusados estaban combinados para admitir a exámenes a personas incapaces para ellos y para expedir título a personas desconocedoras de la profesión de farmacia, facilitándoles las contestaciones porque no conocían las asignaturas requeridas por la ley y que a ese fin unos ejecutaban unos actos y otros de los conspiradores otros, lo que es bastante para llevar a la conclusión de que existía entre ellos una conspiración con el fin indicado, que es contrario a la salud pública y a la debida administración de las leyes, ya que no es necesario probar la conspiración misma porque por lo general sería imposible presentar dicha prueba por evidencia directa dada la reserva con que se adoptan esos planes, consistiendo generalmente la prueba en inferencias o presunciones derivadas de ciertos hechos realizados, siendo bastante cuando uno ejecuta parte del plan de

la combinación y el otro otra parte del mismo para ejecutarlo enteramente, aun cuando jamás se reunieran para concertar los medios o para poner en práctica el propósito común. *People* v. *Donnolly,* 143 Cal. 398; *United States* v. *Sacia,* 2 Fed. 754. En *People* v. *Bentley,* 75 Cal. 409, se cita de Greenleaf lo siguiente: "Si se prueba que los acusados perseguían con sus actos el mismo propósito, frecuentemente por iguales medios, realizando uno una parte y el otro la otra parte para completarlo teniendo en perspectiva la ejecución del mismo fin, el jurado estará justificado en llegar a la conclusión de que estaban confabulados en una conspiración para realizar tal objeto.   3 Greenleaf Ev. sec. 93."

La prueba circunstancial es de tal naturaleza en este caso que después de examinada no puede llevar a ninguna hipótesis consistente con la inculpabilidad de los apelantes.

Aunque el apelante Ramírez alega que la declaración de Juana Albandoz no fué corroborada, sin embargo, resulta lo contrario de la prueba documental que respecto a ella se presentó, pues la lectura de sus exámenes demuestra que fueron copiados de otros, como ella dice, y en los documentos Nos. 43 al 47 se encuentra la corroboración de que fué admitida a exámenes sin tener capacidad para tomarlos.

Sostiene también el apelante Ramírez que no puede tenerse en cuenta para condenarle la declaración de Manuel Colón Bonilla porque era un empleado del Gobierno que lo sobornó y el iniciador de la conspiración alegada en la acusación y que fué una conspiración fabricada y un delito fingido porque sin la participación de Colón Bonilla no podía existir.

Ya hemos visto que sin la intervención de Colón Bonilla se probó que el apelante Ramírez facilitó las contestaciones a Juana Albandoz, pero de todos modos la declaración de dicho testigo es admisible para determinar la existencia de la conspiración perseguida.   No constituye defensa que un agente del Gobierno haya fingido prestar su consentimiento

y facilitado los medios para la comisión de un delito cuando
no se trata de probar dicho delito sino que existía un plan
general para la comisión de actos delictivos, y el caso de *State
v. Dougherty et al.*, 96 Atl. Reporter 57, que el apelante cita
en su alegato no tiene aplicación en este caso porque allí se
trataba de una conspiración de los concejales del municipio
de Atlantic City con un tal Harris, empleado del Gobierno,
para aprobar una ordenanza mediante dinero en la cual Har-
ris era una parte necesaria y su promotor, de tal modo que
la conspiración no tenía existencia sin él, a diferencia del
caso presente en que Clemente Ramírez no fué invitado por
Colón Bonilla para una conspiración general toda vez que
existe prueba de otros actos realizados por Ramírez, y el
acto del agente del Gobierno fué únicamente uno de los esla-
bones para probar la conexión criminal de Ramírez con tal
conspiración.    Colón Bonilla, empleado del Gobierno para
averiguar si era cierto que se estaban vendiendo los títulos
de farmacéuticos, no ideó un delito que no existiera en la
mente de los acusados y que no estuvieran ejecutando sino
que haciéndose pasar por un aspirante a dicho título que no
reunía condiciones para obtenerlo se prestó a la exigencia
de Juliá de que diese dinero y de que se avistara con Ramí-
rez para que le facilitara las contestaciones que debía dar
en el examen.

Aunque el apelante Ramírez sostiene que no hubo prueba
de la alegada conspiración para aprobar exámenes de per-
sonas incapaces de obtener el título de farmacéutico, sin em-
bargo, lo contrario aparece de la prueba de este juicio, no
sólo porque el facilitar las contestaciones de las asignatu-
ras que constituyen la profesión de farmacia demuestra cla-
ramente que querían poner a los aspirantes que accedían
a sus peticiones de dinero en condiciones de que aparecieran
ante la Junta Examinadora como personas aptas para reci-
bir el título correspondiente, sino además a alguno de los as-

pirantes le manifestaron expresamente que los ayudarían para tal fin.

No existe variación alguna, como se alega, entre la acusación y la prueba, porque si bien se probaron distintos actos de pedir dinero por los apelantes para aprobar los exámenes de los aspirantes y admitirlos sin tener condiciones para ellos, ésta era la manera de probar los actos que tendían a la ejecución del delito que se imputó en la acusación. El móvil particular de la conspiración no era importante, pues pudo probarse cualquier otro que no fuera la especulación por dinero, con tal que se probara que había alguno por el cual estaban combinados los acusados para realizar actos contrarios a la debida administración de las leyes o perjudiciales a la salud pública.

En cuanto al error que estamos examinando expone por último Ramírez que la declaración de Colón Bonilla no fué corroborada, pero la prueba demuestra lo contrario, pues hubo esa corroboración ya que el propio Ramírez admite que Colón Bonilla le presentó la carta de recomendación que dice el testigo le entregó Monclova para Ramírez; Colón Bonilla declaró que no conocía a Llauger Díaz ni a Ramos Casellas ni se había examinado con el primero ni practicado en la botica del segundo y dichas personas corroboran que esto es así y que si entregaron las certificaciones en contrario que aparecen con la solicitud de examen de Colón Bonilla fué porque el apelante Juliá se las pidió; el exhibit 13 también corrobora que no tenía los requisitos exigidos para ser admitido a examen porque está firmado sin contestar las preguntas que respecto de ese particular debía contestar; Colón Bonilla manifestó que Ramírez le facilitó las contestaciones de los exámenes para que las copiara y en efecto el detective Lewis las tuvo en sus manos y Spear sacó copia fotográfica de ellas.

El último error que se alega es que la corte admitió erró-

neamente prueba perjudicial al apelante Ramírez a pesar de su oposición.

En cuanto a este particular se. alega que no debió ser admitida la declaración de Carlos Buitrago para corroborar la de Colón Bonilla porque era de referencia sobre actos y manifestaciones de éste, que no era acusado, no había declarado todavía y que también era un cómplice, y .de actos y manifestaciones de otro testigo de apellido Ajenjo, quien tampoco figuraba como acusado ni había declarado todavía.

El juez tiene facultad discrecional en el orden de la presentación de la prueba y no vemos que exista perjuicio para los apelantes en que se admitiera 'la declaración de Buitrago antes de las de Colón Bonilla y de Ajenjo y en realidad debía ser anterior, ya que demostraba cómo había empezado el descubrimiento de la conspiración. Aun admitiendo que Colón Bonilla era un cómplice, Buitrago no lo era porque no aceptó soborno alguno y fué únicamente la persona que puso en relación a Colón Bonilla con Ajenjo para que éste se avistara con el apelante Calderón Aponte. No concreta el apelante Ramírez en su alegato por qué las manifestaciones de Buitrago eran de referencia y más bien parece que su objeción es por haberse admitido como prueba una escritura, pues llama la atención a las páginas 150 y 151 de la transcripción de las que aparece que se presentó y admitió una escritura otorgada por Colón Bonilla ante Buitrago como notario, que no fué protocolizada ni firmada por testigos conteniendo ciertas constancias de una libreta con contestaciones que exhibió Colón Bonilla con tal fin al notario; objeción que se fundó en ser prueba secundaria, en ser de referencia y por no haber intervenido en ella los acusados.

No hubo perjuicio en la admisión de ese documento porque los hechos en ella expresados fueron también declarados por los testigos y en cuanto a toda la prueba que pudiera ser de referencia no sólo el juez la admitió manifestando que le daría el valor que en derecho tuviera sino que según hemos

declarado antes de ahora ''en los casos juzgados ante el tribunal de derecho la admisión de prueba impertinente para ser considerada por el juez en conjunto con todo el resto de la prueba, no constituye un error que sirva de base para revocar la sentencia porque el tribunal, al resolver, apreciará todos los elementos probatorios en conjunto, dando a cada uno la importancia que merece.'' *El Pueblo* v. *Vélez,* 17 D. P. R. 1015.

La declaración de Aureliano Ortiz también fué admisible porque habiendo declarado Bonilla que presentó al apelante Juliá una carta del Sr. Monclova, dicho Ortiz lo corrobora en este particular.

La declaración de López Molina no solamente demostró un convenio con Calderón Aponte para admitirlo a exámenes mediante dinero, sino que, como hemos dicho antes, relacionó a dicho Calderón con Juliá, quien siendo el encargado de la matrícula lo admitió sin tener condiciones para ser admitido a ello, por lo que no hubo error en permitirla.

Con respecto a la carta que se presentó escrita por Ajenjo a Buitrago, no vemos que la objeción se hiciera claramente en la corte inferior por ser prueba de referencia.

Ya hemos dicho que no hubo variación entre la acusación y las pruebas y, por tanto, no hubo error en la corte inferior al admitir prueba respecto a la exigencia de dinero por parte de los apelantes para aprobar como farmacéuticos a personas que no tenían derecho al título, ya por carecer de los estudios previos exigidos por la ley o del conocimiento de las asignaturas de esa profesión, porque con ella trataba de demostrarse la conspiración alegada en la acusación, la que daba aviso a los acusados de que se presentaría prueba respecto a esos hechos.

La mayor parte de las objeciones hechas por Ramírez en el juicio descansan en la teoría equivocada de que el Fiscal probaba sobornos individuales cuando el objeto de estas pruebas era demostrar el plan de la conspiración de los acusados.

Otros errores en cuanto a admisión de pruebas que menciona el apelante, tienen relación con materias antes tratadas y no es necesario considerarlos de nuevo.

Para terminar diremos que el abogado del apelante Calderón Aponte manifestó en la vista del caso ante nosotros que de acuerdo con la nueva Ley Orgánica de esta Isla, aprobada por el Congreso de los Estados Unidos y por el Presidente en 2 de marzo último, conocida con el nombre de "Bill Jones," los acusados tenían derecho a ser juzgados por un jurado. No tenemos necesidad de considerar esa cuestión porque dicha ley fué aprobada después de la celebración del juicio.

No queremos poner fin a esta opinión sin expresar que los hechos realizados por los apelantes, a quienes la comunidad había encargado por conducto del Gobernador, de la custodia de su salud pública mediante el cumplimiento de la ley para expedir títulos de farmacéuticos, son hechos de tal naturaleza repugnantes y criminales que el juez sentenciador procedió bien al imponerles como castigo la pena máxima que para tal delito señala el Código Penal.

La sentencia apelada debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Hutchison.